## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, THOMAS W. CORBETT, JR., GOVERNOR,<br><br><br>Plaintiff<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>Defendant | Civil Action No. |

## COMPLAINT

The Commonwealth of Pennsylvania ("Commonwealth"), by Governor Thomas W. Corbett, Jr., brings this action as *parens patriae* for the natural citizens of the Commonwealth for injunctive relief against the National Collegiate Athletic Association ("NCAA") under Section 16 of the Clayton Act, 15 U.S.C. § 26, for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### I.    NATURE OF ACTION

1.      For more than 40 years, the football program at Pennsylvania State University ("Penn State") has been an important economic engine supporting Pennsylvanians across the Commonwealth. On fall weekends, fans and alumni have regularly traveled to State College to attend Penn State games, tailgate with family and friends, and spend the weekend visiting the Penn State campus. As a result, Penn

State football has played a major role not only as a focus of campus life, but as a generator of revenue for a proud university, a leading tourist attraction, and a creator of jobs in the Commonwealth.

2.      This suit arises out of the NCAA and its member institutions' arbitrary and capricious application of their enforcement power for the purpose of crippling Penn State football, thereby harming citizens of the Commonwealth who benefit from a successful football program at Penn State, among them citizens who earn income by working in the stadium on game days; the shop owners whose small businesses generate significant revenue from the sale of Penn State memorabilia; the students who help pay tuition by waiting tables filled with alumni and fans who patronize restaurants and bars before and after games; the hotel owners and employees whose jobs depend on the continued influx of tourists to central Pennsylvania; and the Penn State swimmers and other athletes whose programs are largely funded by football revenue.

3.      The NCAA is accomplishing this goal by exploiting, to burnish its own often derided public reputation, a tragic and notorious child sexual abuse scandal that became one of the most closely followed news stories in the nation between November 2011 and July 2012.  Instead of allowing the justice system to resolve this series of events, the NCAA used Penn State's tarnished public image as an opportunity to force the university to endure harsh, unjustified, and unprecedented

punishments.  Penn State was forced to sign away its procedural rights, including an investigation of the charges against it, factual findings that NCAA rules were violated, a hearing before the NCAA's Committee on Infractions, and an appeal of any adverse ruling.  These punishments threaten to have a devastating, long-lasting, and irreparable effect on the Commonwealth, its citizens, and its economy.

4.     The NCAA is a trade association of competitors, formed for the purpose of promoting intercollegiate athletic competition, in part through self-regulating its members to ensure fair competition on the playing field and the protection of participating student-athletes.  While the antitrust laws permit such an association to impose and enforce rules or standards to promote certain procompetitive purposes, such rules must be reasonably related to those purposes, and must be enforced through procedures designed to prevent their arbitrary application.

5.     The NCAA's sanctions against Penn State fail to meet these requirements.  The NCAA has punished Penn State without citing a single concrete NCAA rule that Penn State has broken, for conduct that in no way compromised the NCAA's mission of fair competition, and with a complete disregard for the NCAA's own enforcement procedures.  In so doing, the NCAA and its members have forced Penn State to forfeit the valuable competitive advantages of full participation in the NCAA.

6.      While the Commonwealth emphatically repudiates the conduct of the university officials who allegedly knew about the underlying offenses and failed to report them to law enforcement authorities, the NCAA should not be permitted to exploit the tragedy in a way that harms Pennsylvanians and decreases the revenue base that supports worthy Commonwealth programs merely to enhance the NCAA's own reputation and the competing football programs of the NCAA member colleges and universities.

7.      The NCAA took the public position that its unique and unprecedented actions were necessary to correct a "culture" at Penn State that improperly exalted the football program to a position of "deference" and "reverence" within the university. While the role of football and other high-profile sports on college campuses is certainly a legitimate subject for debate, the notion that this phenomenon is in any way unique to Penn State defies credulity.  Moreover, given the NCAA's pivotal role in creating and profiting from the "culture" it now decries, its stated justification for its attack on Penn State and the Commonwealth must be viewed as a pretext for the real motives of the NCAA and its president:  the opportunity to gain leverage in the court of public opinion, boost the reputation and power of the NCAA's president, enhance the competitive position of certain NCAA members, and weaken a fellow competitor.

## II.   PARTIES

8.      Plaintiff is the Commonwealth of Pennsylvania, acting by and through its Governor, Thomas W. Corbett, Jr.  Under Pennsylvania law, the Attorney General of the Commonwealth is authorized to bring actions on behalf of Pennsylvania and its citizens for violations of the antitrust laws of the United States. The Commonwealth Attorneys Act, however, permits the Governor's Office of General Counsel to initiate such actions upon a delegation of that authority by the Attorney General. *See* 71 P.S. § 732-204(c).   In accordance with the statute, Governor Corbett sought and received such a delegation from the Attorney General.

9.      Defendant NCAA is an unincorporated member association of more than 1,000 colleges and universities located throughout the United States.   The NCAA maintains its headquarters and principal place of business in Indianapolis, Indiana.  The majority of the NCAA's members are institutions of higher education (hereinafter collectively referred to as "members" or "member institutions"). Through agreements with its member colleges and universities, the NCAA regulates and coordinates the business of college sports in the United States.

10.     As described by the NCAA on its website, the NCAA was founded "as a way to protect student-athletes" and "continues to implement that principle with increased emphasis on both athletics and academic excellence."  According to the website, "[t]he NCAA enforcement program strives to maintain a level playing field

for the more than 400,000 student-athletes.   Commitment to fair play is a bedrock principle of the NCAA. . . . A fundamental principle of the enforcement program is to ensure that institutions abiding by NCAA legislation are not disadvantaged by complying with the rules."   In furtherance of these principles, the NCAA regularly investigates and sanctions collegiate athletic programs for violations of NCAA rules designed to ensure fairness on the playing field.   These rules include limitations on financial compensation to student-athletes, limitations on communication between athletic programs and high school recruits, limitations on team practices, and requirements that student-athletes achieve minimum academic standards.

11.     Given the growing popularity of college athletics, particularly football and basketball, the NCAA has become one of the most powerful institutions in American sports.   It awards more than eighty championships annually in a variety of men's and women's collegiate sports, including the "March Madness" men's basketball tournament that provides the NCAA with more than $500 million annually in television revenue alone.   The NCAA is "big business" in the United States, amassing nearly $846 million in annual revenue in 2010-11.     (See http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/Revenue).

12.     Because of the NCAA's role in intercollegiate athletics, operation of a major college football program like Penn State's requires a college or university to be an NCAA member, and to subject itself to the NCAA's myriad rules and regulations.

6

### III.   JURISDICTION & VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

14.     Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and the defendant transacted business in this district.

15.     This Court has personal jurisdiction over defendant because defendant transacted business in this district, and was engaged in an illegal scheme that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this district.

### IV.   FACTUAL BACKGROUND

**A.     The Penn State Football Program**

16.     Division I college football is big business, generating hundreds of millions of dollars of annual revenue, and Penn State has long been one of its most successful and storied programs.  Penn State football is rich in tradition, loyalty, and on-field success, having won two national championships, three Big Ten Conference titles, and invitations to 26 postseason bowl games during the last 40 years.

17.     In 2010-2011, Penn State football was the second most profitable collegiate athletics program in the nation, earning over $50 million, and was the most profitable program amongst its immediate competitors in the Big Ten Conference.

Penn State football was also the most valuable contributor to intercollegiate expenses for all NCAA student-athletes at the university, providing 37 percent of the revenue for athletic programs in the 2011 fiscal year. This revenue represents more than twice the amount provided by the next most valuable source, donations from alumni and friends of the university. Because the football program amounted to only 15 percent of athletics expenses, Penn State football funded other varsity programs, scholarships and other academic services for student-athletes including counseling, and similar operational expenses. In short, Penn State football has long been a significant economic driver of the university, playing an important role in enabling the university to offer a variety of first-rate programs through resources other than student tuition.

18.    Moreover, Penn State achieved its football success without compromising the academic performance of its football players. Penn State's football program perennially boasts one of the highest graduation rates among Division I football programs. Up until the revelation of the sexual abuse scandal that rocked the campus in November 2011, Penn State football's reputation for "success with honor" made it the envy of its peers.

19.    The Penn State football program also generates substantial revenue for the Pennsylvania economy. Prior to the NCAA sanctions, it was estimated that approximately 15 percent of visitors to Penn State football were from outside the

Commonwealth, and that each out-of-state attendee to a Penn State football game was accompanied on his or her trip to the Commonwealth by, on average, 1.5 additional visitors who did not attend the game.  As a result, according to one study, Penn State football generated  $161.5 million in business volume impact in 2009, with $90 million benefitting Centre County alone.  The same study found that Penn State football spent $16 million in Pennsylvania on goods and services with contractors and vendors in 2009—essentially pumping money back into the Pennsylvania economy during the downturn.

20.     The football program was found to create approximately 2,200 jobs for hardworking Pennsylvanians—both direct jobs, such as box office and concessions staff, ushers, and parking attendants, and indirect jobs, ranging from shopkeepers to restaurant staff to housekeepers at local hotels.  The football program also generates over $5 million in tax  revenue and supports a number of community programs run through and in conjunction with football and student-athletes.

21.     Penn State football also has served as a centerpiece of campus life for the 44,000 students who attend Penn State, and the program carries a strong public association with a first-class state university that is a source of pride throughout the Commonwealth.  The substantial levels of giving from alumni and friends of the university are undoubtedly engendered in part through the strong connections

between the university and its alumni that a legendary football program has continued to foster.

### B.   NCAA Oversight of Collegiate Athletics

22.     The NCAA regulates and coordinates the business of college sports in the United States.  Its purported mission is to regulate competition, protect the role of student athletics in educational programs at member institutions, and ensure that participants in intercollegiate athletics are treated as "student-athletes" whose academic education takes precedence over athletics.

23.     In practice, however, the NCAA's primary function has been to maximize the revenue generated for its member institutions, primarily through college football and men's basketball.  Approximately 90 percent of the NCAA's revenue is derived from its television contract for the men's basketball tournament, which the NCAA has successfully marketed as a major television event over three weekends each spring.  While the NCAA has outsourced its football postseason to money-making bowl games and the Bowl Championship Series, college football also has become an enormous source of revenue for NCAA member institutions.

24.     In recent years, the NCAA's rules and enforcement decisions have been a target of widespread and increasing media and public criticism.  Because the NCAA's role in promoting college athletics arguably creates a disincentive to impose punishments on the most lucrative football and men's basketball programs, the

NCAA's inconsistent enforcement decisions have led to a popular perception that the NCAA is more interested in creating the appearance of protecting "student-athletes" than in actually doing so.

25.     The NCAA enforces its regulations through procedures listed in a Constitution and Bylaws (hereinafter, the "Manual"), which set forth the operational structure of the Association, the rules governing member institutions, and procedural mechanisms by which the NCAA regulates student-athletes and member institutions.

26.     The NCAA's leadership comprises representatives of competitor universities and conferences.   The Executive Committee is responsible for administrative and policy tasks, including budget oversight, the conduct of litigation, calling necessary meetings and conventions, and coordinating catastrophic and disability insurance.  The Division I Board of Directors, which governs "Division I" institutions including Penn State, has administrative and legislative duties that include approving and ratifying the actions of councils delegated by membership to have legislative and enforcement authority.  The President is responsible for certain operational day-to-day functions such as convention arrangements, multidivisional classification, contact with member institutions, championship administration, advertising, use of broadcast footage, expenses, and hiring administrative personnel.

27.     The Manual does not provide for the President, the Executive Committee, or the Division I Board of Directors to have any role in investigating

potential rules infractions or issuing sanctions.  Under the Manual, the only NCAA entity permitted to administer the NCAA enforcement program is the Committee on Infractions.

28.     According to the Manual, the enforcement provisions are explicitly designed to protect "fairness of procedures," serving the paramount concern of protecting student-athletes.  No enforcement action may be brought or discussed directly with the member institution outside of the Committee on Infractions' process.  Indeed, the President, Board of Directors, and Executive Committee are explicitly *barred* from participating in enforcement proceedings, and they are not permitted to review sanctions by the Committee on Infractions or its Appeals Committee.

29.     To protect member institutions and innocent student-athletes from unfair sanctioning, the Manual includes a hearing procedure for processing violations of NCAA rules.  The hearing procedure provides a member institution the right to appear and present evidence, as well as appeal any sanctions it believes may reach too far and affect innocent parties.

30.     While the NCAA has a range of sanctions available to the Committee on Infractions, the so-called "death penalty" is the most extreme, banning a member institution from competing in a particular sport.  Consistent with its mission in support of amateur student-athletes and fair play, the NCAA has used the death

penalty against Division I institutions in extremely limited circumstances directly affecting student-athletes or member competitiveness: for taking bribes to shave points and for impermissible financial aid (University of Kentucky 1952); for cash payments, impermissible monetary perks, and academic fraud including forging transcripts and using surrogates to take exams for recruits (University of Southwestern Louisiana 1973); and for direct cash payments to athletes (Southern Methodist University 1986). The Committee on Infractions considered, but declined to impose, the death penalty for extensive recruiting and eligibility violations (University of Kentucky 1989) and academic fraud, benefits to players, and deceit by the institution to the NCAA (Texas Southern 2012).

31.     From the NCAA's adoption of the current infractions regime until the events described below, no member institution faced a threat of the "death penalty or other sanctions" from its competitors on the Executive Committee and the Board of Directors, who sit outside of the enforcement process and are barred from issuing sanctions or taking any position on alleged infractions.

### C.     Dr. Mark A. Emmert, President of the NCAA

32.     Dr. Mark A. Emmert is the President of the NCAA, having become the fifth president of the nonprofit organization in October 2010. According to USA Today, in running the non-profit NCAA, Dr. Emmert is paid $1.6 million per year— nearly 40 percent more than his predecessor. The substantial increase was the result

of a decision of the Administrative Committee of the NCAA Executive Committee, the members of which clearly had an expanded role in mind for their new president.

33.     When Dr. Emmert assumed the presidency, the NCAA was under fire by critics who assailed the organization for having been inconsistent in its imposition of sanctions for violations of NCAA rules by member institutions and for being generally ineffective in administering NCAA rules enforcement procedures. Even under Dr. Emmert's leadership, the organization continued to be plagued by dogged criticism of the NCAA's mishandling of several high-profile disciplinary matters involving national member institutions with elite football programs, including Auburn University, the University of Southern California, and The Ohio State University.

34.     Having assumed control of an organization with a reputation for being soft on discipline, particularly with respect to those member institutions with the most successful and lucrative sports programs, Dr. Emmert was under a mandate to change the NCAA's reputation, even if doing so meant circumventing the procedures established in the Manual. In August 2011, Dr. Emmert asserted that such sweeping reforms had been "on [his] mind" since he first decided he wanted to take the job as President of the NCAA in 2010. (See NCAA.com; July 19, 2011 - http://www.ncaa.com/news/ncaa/2011-07-19/emmert-substantial-change-needed).

35.     Dr. Emmert and the NCAA's leadership, however, faced a key obstacle. While the NCAA's member institutions were eager, as a body, to appear to be more aggressive in enforcing NCAA rules, no institution, understandably, was prepared to waive the rights afforded it in the Manual.

36.     In November 2011, the indictment of a despicable child predator, a former long-time assistant coach of the Penn State football team, provided Dr. Emmert with the opportunity he needed to signal emphatically that the NCAA—his NCAA—would never again be regarded as soft on disciplining its member institutions, particularly those institutions with elite football programs that Dr. Emmert and the NCAA had been criticized for failing to discipline adequately until that time. The fact that the alleged actions of those involved in the tragic events at Penn State were criminal, and that no violations of NCAA rules had been identified, would not dissuade Dr. Emmert from seizing upon the international publicity that the Penn State matter had instantly attracted to make a show of unprecedented and aggressive discipline—discipline that he, with the input of a handful of university presidents and chancellors, would determine and impose. Once and for all, the NCAA would shed the reputation of being soft on discipline, even if doing so meant ignoring the existing NCAA rules and processes that its member institutions justifiably expected and to which they were entitled. Given such an opportunity, the well-being of Penn State students and alumni, the employment of thousands of

Pennsylvanians, and the economy of the Commonwealth were matters with which Dr. Emmert could not be concerned.

### D.     Indictment and Trial of Gerald A. Sandusky

37.     On November 4, 2011, the Commonwealth filed criminal charges against Gerald A. Sandusky after an extensive and wide-reaching grand jury investigation into reports of Sandusky's alleged sexual abuse of children.  That same day, the Commonwealth filed criminal charges against Penn State's Athletic Director, Timothy M. Curley, and its Senior Vice President-Finance and Business, Gary C. Schultz, for allegedly failing to report allegations of child abuse by Sandusky to law enforcement or child protection authorities in 2002 and for allegedly committing perjury during their testimony about the allegations to the Grand Jury in Dauphin County, Pennsylvania, in January 2011 (together, the "Sandusky Offenses").

38.     From the moment that news of the pending indictment of Sandusky broke, the Sandusky Offenses generated national headlines on a daily basis.  In the days and weeks following the revelation of the Sandusky Offenses, Penn State's handling of the Sandusky Offenses became a target of federal as well as state law enforcement authorities, and the Sandusky Offenses created a public relations crisis for the university.  In a matter of weeks, a university community that had rallied around its popular and respected football program for more than forty years suddenly found itself broken.

16

39.     On June 22, 2012, a Centre County jury in Bellefonte, Pennsylvania found Sandusky guilty of 45 counts of the criminal charges against him.  On October 9, 2012, Sandusky was sentenced to a term of 30 to 60 years in prison, effectively guaranteeing that he would spend the remainder of his life in jail.  On November 1, 2012, the Attorney General announced that Curley, Schultz, and former Penn State President Graham Spanier had been charged by a grand jury with perjury, conspiracy, obstruction of justice, and child endangerment.  These cases have not, as of the filing of this Complaint, been brought to trial.

40.     The Sandusky Offenses were horrific.  The severity of their effect on Sandusky's victims, the Penn State community, and the Commonwealth as a whole cannot be overstated.  Governor Corbett and the government of the Commonwealth of Pennsylvania unequivocally condemn the actions of Jerry Sandusky and the alleged failures of any university official that contributed to the concealment of abuse perpetrated by a despicable child predator.

### E.     The Freeh Report

41.     In the wake of the filing of criminal charges against Sandusky, Curley and Schultz, on November 21, 2011, Penn State commissioned the law firm of Freeh Sporkin & Sullivan LLP, led by former FBI Director Louis Freeh, at a cost to the university of approximately $6.5 million, to investigate the failure of Penn State

personnel to respond to and report Sandusky's crimes and the circumstances under which they could occur.

42.     On July 12, 2012, Freeh Sporkin & Sullivan LLP issued a 267-page report of its findings (the "Freeh Report").  The Freeh Report was unsparing in its criticism of Penn State leadership, concluding, among other things, that the most senior leaders at Penn State had exhibited "total and consistent disregard . . . for the safety and welfare of Sandusky's victims" and had worked together to conceal Sandusky's crimes for fear of bad publicity and out of sympathy for Sandusky.

43.     The fallout from the Freeh Report was swift, blunt, and far-reaching. Press reports uniformly condemned the Penn State leadership that had, according to the report, allowed Sandusky's crimes to continue for years.  Penn State promptly issued a statement recognizing the "sad and sobering" nature of the Freeh Report, accepted full responsibility for the failure of its administration to protect the welfare of children, and began the process of implementing many of the recommendations included in the Freeh Report.

**F.     The NCAA Becomes Involved**

44.     It became clear after the announcement of the Sandusky Offenses in November 2011 that Penn State would have to answer to law and other enforcement and oversight authorities on multiple fronts for the alleged conduct of university personnel and leadership.  The criminal investigation of the Sandusky Offenses was

ongoing. Penn State faced an investigation by the U.S. Department of Education into whether the university failed to report incidents of sexual abuse on campus, as required by federal law. The Board of Trustees had already announced plans for an internal investigation, the faculty senate was calling for an independent investigation, and the trustees were known to be in the process of retaining an independent firm to begin the investigation that would result in the Freeh Report. Penn State's public image had been significantly tarnished.

45.     The NCAA, however, was not about to miss an opportunity to bring Penn State down even further, or to attempt to improve its own public image by asserting its relevance as a protector of "student-athletes." For Dr. Emmert and the Executive Committee, this was the opportunity to swiftly accomplish what the NCAA rules did not then allow. Although the Freeh Report did not find any violation of NCAA rules, or any conduct traditionally sanctioned by the NCAA, the NCAA chose to "pile on" to the valid actions of law enforcement authorities against a weakened member institution with a "me too" investigation.

46.     Dr. Emmert's decision to make an example of a weakened Penn State came soon after the criminal indictments, and prematurely forecasted that the process the NCAA would employ in doling out punishment would radically depart from its established rules and procedures. On November 17, 2011, Dr. Emmert issued a letter to Penn State President Rodney Erickson demanding Penn State's production of

information related to the grand jury indictment.  After issuing the letter, Dr. Emmert

posted it on the NCAA's website, itself a departure from the NCAA's long-standing

tradition of not publicizing its commencement of investigations against its member

institutions:  This disciplinary action would be different, and Dr. Emmert wanted

everyone to know it.  In issuing the letter, Dr. Emmert ended any notion that Penn

State would object to the procedures he intended to employ or the discipline he would

impose when he wrote: "I look forward to the complete cooperation of Penn State in

our review *and any future action that we may take.*"    (NCAA Letter to PSU,

November 17, 2011) (emphasis added).   Dr. Emmert's foreboding reference to

"future action that [the NCAA] may take" was made more than seven months before

the publication of the Freeh Report, the sole factual basis upon which the NCAA

would rely to rationalize the unprecedented sanctions it imposed on Penn State.

47.    Upon information and belief, the NCAA's decision to conduct an

inquiry of a member's exercise of institutional control, without any suspected

accompanying violation of a specific NCAA rule or bylaw, is unprecedented.  Until

the public announcement of the Sandusky Offenses, the NCAA's enforcement

activity had been confined to NCAA rules governing the recruitment of prospective

student-athletes, the eligibility of student-athletes, and practice and competition—

rules designed to further the NCAA's legitimate purposes of ensuring a level playing

field for athletic competition and protecting student-athletes from the excessive

pursuit of athletic success at their expense.   Never before had the NCAA injected itself into offenses that did not involve cheating, academic fraud, recruiting violations, or other conduct designed to give athletic programs an unfair competitive advantage.   Yet, Penn State, for obvious reasons, had no choice but to state publicly that it would cooperate with the NCAA's involvement.

48.      Other than send and publicize the November 17 letter, the NCAA did very little with respect to its inquiry in the months that followed.   Following the publication of the Freeh Report in July 2012, however, the NCAA made its move— but not, as the Manual requires, through the Committee on Infractions.   Instead, Dr. Emmert took the matter directly to the Executive Committee and Division I Board of Directors.   Not surprisingly, these core groups—which consisted of presidents and chancellors of Penn State's competitor colleges and universities—chose to seize the opportunity to impose swift and severe sanctions that caused no harm to the perpetrators of the Sandusky Offenses, but would severely cripple a major competitor and irreparably harm the citizens of the Commonwealth.   These punishments included:

> (a)      A $60 million fine, payable over a five-year period, to be paid into an endowment for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse;

(b)     A four-year ban on football postseason play, including bowl games;

(c)     A four-year reduction in football scholarships from 85 to 65 total scholarships per year and from 25 to 15 initial scholarships per year;

(d)     Four years of probation, including appointment of an on-campus, independent integrity monitor;

(e)     Vacation of all football wins between 1998 and 2011;

(f)     Waiver of NCAA rules restricting transfer of student-athletes between colleges, so as to permit football players to transfer from Penn State to another institution without having to sit out a year before competing, as is normally required of transferring student-athletes; and

(g)     Requiring Penn State to permit football players wishing to remain at Penn State to retain their athletic scholarships, regardless of whether they continue to play football.

49.     Dr. Emmert and the presidents and chancellors, however, faced what ordinarily would be significant obstacles to imposing such unprecedented sanctions. The NCAA Manual vests enforcement authority in the Committee on Infractions, and expressly bars involvement by the President, the Executive Committee, or the Division I Board of Directors.  And the Committee on Infractions issues sanctions only after conducting an investigation and providing the accused member institution

with an opportunity for a hearing and a right to appeal.  Given that Penn State did not engage in any conduct expressly prohibited by any NCAA rule, but was suspected only of violating vague principles of "institutional control" and "individual integrity," a finding that Penn State violated NCAA rules would not be a certainty.  In fact, it would require the Committee on Infractions to take the unprecedented step of sanctioning a member institution *solely* for violating these vague principles, without any accompanying concrete infraction.

50.     In order to avert these difficult challenges, Dr. Emmert and the presidents and chancellors found a convenient path around the NCAA's due process protections.  They simply informed Penn State what the punishments would be, and threatened that if Penn State did not waive its right to due process and accept the sanctions offered, the NCAA would impose the "death penalty" for four years. While such a dilemma would seemingly merit a thoughtful discussion among university leadership, the NCAA further threatened President Erickson that the deal would be taken off the table if any word of the "negotiations" was leaked to the media—thereby precluding any possibility of meaningful consideration by the Penn State Board of Trustees.  The type of  "complete cooperation" that Dr. Emmert advised Penn State he looked forward to receiving in his November 17, 2011 letter was now clear:  accept unprecedented sanctions and ignore the NCAA's flagrant

disregard of its own procedures in issuing such sanctions, or Penn State would wish it had.

### G.    The "Consent" Decree

51.    Penn State had no practical alternative but to accept the sanctions.  On July 23, 2012, just eleven days after the release of the Freeh Report, President Erickson reluctantly entered into a consent decree with the NCAA imposing the proposed sanctions and waiving "any claim to further process, including, without limitation, any right to a determination of violations by the NCAA Committee on Infractions, any appeal under NCAA rules, and any judicial process related to the subject matter of this Consent Decree."

52.    The consent decree did not set forth any specific NCAA rule or requirement violated by Penn State.  Instead, it cited a "failure to value and uphold institutional integrity," "failure to maintain minimal standards of appropriate and responsible conduct," and "lack of adherence to fundamental notions of individual integrity."

53.    Moreover, the consent decree acknowledged that, since Penn State had succumbed to the NCAA's coercion and accepted the "findings" set forth in the consent decree, "traditional investigative and administrative proceedings"—*i.e.*, due process—would be "unnecessary."  Instead, the consent decree stated, Penn State's

acquiescence to the NCAA's fiat permitted "an expedited timetable" for imposing sanctions.

54.     Remarkably, the consent decree acknowledged the extraordinary nature of the NCAA's involvement: "The sexual abuse of children on a university campus by a former university official—and even the active concealment of that abuse—while despicable, *ordinarily would not be actionable by the NCAA*." (Emphasis added.)  What purportedly made Penn State's case unique, according to the consent decree, was that the Sandusky Offenses were enabled by a "culture" of "fear of or deference to the omnipotent football program" and a "reverence for Penn State football."

55.     In reality, the NCAA's attack on Penn State had nothing to do with the perceived "culture" of Penn State football.  Division I college football is a huge generator of revenue for participating institutions, and virtually all "football schools" treat their football coaches and programs with "deference" and "reverence."  The NCAA, of course, contributes directly to this "culture" by permitting and condoning lucrative television and apparel contracts for its major conferences and institutions, outsourcing its postseason to for-profit entities such as bowl games and the Bowl Championship Series, and allowing the contests between its most skilled "student-athletes" to become national prime time entertainment on a weekly basis.  The widespread nature of the "culture" the NCAA claims to have found to be unique to

Penn State is perhaps best illustrated by the public remarks of the president of The Ohio State University, who, when asked whether he considered firing Ohio State's successful head football coach after major NCAA rules violations, replied, "I'm just hopeful that the coach doesn't dismiss me."

56.     The NCAA's attempt to insert itself here is so inconsistent with its prior conduct in similar situations that it can be seen only as a clumsy attempt to garner positive publicity for itself by harming a competitive member school.  There are a number of publicly reported examples of criminal conduct by college athletes where the university leadership is alleged to have covered up or enabled the crimes— and the NCAA did little, if anything, about it:

(a)     In 2003, when one Baylor University basketball player murdered another, secretly recorded audiotapes revealed that the team's coach tried to cover up the allegations by telling assistant coaches and players to lie to investigators and say the slain player had been dealing drugs to pay for school.  Although the NCAA imposed penalties for competition-related violations, such as the payments by the coaching staff to athletes, it imposed no penalties relating to the murder and cover-up.

(b)     In 2010, a University of Virginia men's lacrosse player murdered his former girlfriend, who played for the women's lacrosse team. The victim's mother has alleged in a lawsuit that the university, its athletic

director, and its lacrosse coaches ignored the perpetrator's erratic behavior, including multiple alcohol-related arrests, frequent intoxication, and attacks on another female university athlete.   The NCAA has not taken action against the University of Virginia.

(c)   The U.S. Department of Justice has alleged that the University of Montana failed to investigate or prosecute numerous allegations of rape by Montana football players.   The NCAA has not taken action against the University of Montana.

(d)   A recent internal investigation at the University of North Carolina revealed massive academic fraud, including unauthorized grade changes by forged signatures, and classes in which no instruction took place; approximately forty percent of the students enrolled in these classes were football and basketball players.   In August 2012, one month after sanctioning Penn State, the NCAA took the public position that none of the alleged conduct violated NCAA rules.

57.   The capriciousness of the NCAA's decision to single out Penn State is further reflected in numerous comments made by Dr. Emmert about the supposed "unique" and "unprecedented" nature of the "culture" problem at Penn State.   For example, at his news conference announcing the consent decree, Dr. Emmert responded to questions about the enforcement precedent the Penn State sanctions

might create by saying the Penn State case was "incredibly unprecedented in every aspect of it, as are these actions that we're taking today . . . . This is a very distinct and very unique circumstance."  Dr. Emmert also asserted that "it's important to separate this from a traditional enforcement case. . . . This was and is action by the Executive Committee exercising their authority. . . . It was completely different than an enforcement process."  With these statements, Dr. Emmert and the Executive Committee attempted to ensure that the sanctions against Penn State, and the abdication of any procedural rights that should have been afforded to Penn State, would not be compared to any past or future NCAA enforcement actions.

58.     Moreover, although the NCAA approved a new enforcement structure on October 30, 2012, which will take effect in August 2013, the new procedures— like the current Manual—contain nothing even remotely resembling the "methodology" used by the NCAA in forcing sanctions on Penn State.  Neither do the changes include any prohibition on a "culture" of "deference" to athletic programs.  The absence from the new procedures of any additional rules that would have addressed the Sandusky Offenses, or of any transfer of enforcement power to the President, the Executive Committee, or the Division I Board of Directors, further suggests that the NCAA leadership is not contemplating treating any other member institution the way it treated Penn State.

59.     The NCAA's role in creating the widespread "football culture," and its inaction in the face of less-publicized criminal violations arguably attributable to a lack of institutional control, demonstrate that the NCAA's allegations about the Penn State "football culture" were merely a pretext for the NCAA's unspoken reason for singling out Penn State for unprecedented punishment: because Penn State, given the nature of the Sandusky Offenses, simply could not fight back.  Unlike the other incidents of alleged corruption infecting college athletics, the Penn State events were reported daily on the national news and had seeped into the public consciousness. The NCAA knew that the high-profile and well-deserved public vilification of the university officials who allegedly failed to report the Sandusky Offenses had placed Penn State in a position where resistance to any sanction, from any source, would be futile and would negate Penn State's effort to rebuild its public image.

60.     In the weeks following the NCAA's gutting of the Penn State football program, at least ten Penn State football players transferred from Penn State, taking advantage of the NCAA's sanction that allowed them to play immediately for competing schools.  At least five football recruits severed their commitments to Penn State.  Like children looting a newly broken piñata, competing colleges and universities promptly snapped up the newly available football players, strengthening their own football programs at the expense of the one the NCAA had conspired to decimate.

### H.    Antitrust Violations

61.     The egregiousness of the Sandusky Offenses, and the behavior of top Penn State officials in allegedly failing to report them, is beyond dispute.  Yet the NCAA, and the competing colleges and universities represented on its governing boards, cynically and hypocritically exploited the tragedy of the Sandusky Offenses as a "blank check" to impose crippling and unprecedented sanctions on an already weakened competitor.

62.     The fact that the NCAA had never before punished a school for criminal behavior and that its rules did not provide for such punishment did not stop the NCAA in this instance.   Dr. Emmert and the NCAA exercised their power through a never-before-used process, one specifically designed to cripple a member institution's football program.    In this new approach, the NCAA's leaders and governing committees, rather than the traditional investigators and Committee on Infractions authorized by NCAA rules, imposed the penalties.   By doing so, they declared that the NCAA and its president have the authority not only to enforce specific rules, but to cripple a collegiate athletic program for what they determined was inappropriate conduct.   While what occurred at Penn State was both criminal and heinous, it is unclear, at best, that the conduct violated any of the rules as written in the NCAA's voluminous rulebook and policed by its enforcement staff. Consequently, the NCAA's discipline of Penn State is an unprecedented approach

that dramatically broadens the scope of punishable offenses, but, as Dr. Emmert has suggested, may not be used again for years, if ever.

63.     The actions by the NCAA, its member institutions, and specifically the institutions represented on the NCAA's executive committee and board of directors, in threatening Penn State with the football "death penalty" and forcing Penn State into accepting the consent decree, constitute concerted action within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.   The NCAA, as an organization of competitors, is prohibited from imposing, and arbitrarily enforcing, rules that bear no reasonable relationship to the NCAA's need for self-regulation for the purpose of denying the benefits of participation to a single competitor, and thereby lessening competition.

64.     The NCAA's stated requirements of "institutional integrity," "appropriate and responsible conduct," and "fundamental notions of individual integrity" are unreasonably vague; have been arbitrarily, capriciously, and selectively enforced; and, as applied to Penn State, are not reasonably related to the NCAA's stated purpose of promoting the fairness and integrity of collegiate athletic competition.

65.     The sanctions levied against Penn State were not intended to accomplish any end within the contemplation of any policy justifying college athletics' self-regulation through the NCAA.   The conduct for which Penn State was

sanctioned consisted of alleged failures to report criminal activity on campus that did not impact fairness or integrity on the playing field. Unlike any previous sanctions imposed by the NCAA, the sanctions against Penn State do not even ostensibly serve the NCAA's stated goal of protecting the fairness of intercollegiate athletic competition. Rather, they were taken for the purposes of debilitating a once-powerful football program, enhancing the NCAA's own reputation, and boosting the competing football programs of certain member colleges and universities by removing from competition one of the leading competitors.

66.     The sanctions levied against Penn State were completely arbitrary, and the NCAA provided no procedural safeguards to protect against arbitrariness. To the contrary, the NCAA ignored its own procedural safeguards, exploiting Penn State's vulnerable public position to force Penn State to agree to a complete and unprecedented waiver of NCAA due process.

67.     The NCAA, its member colleges and universities, and particularly, the competitor colleges and universities engaged in this collective assault on Penn State for the purpose of enhancing their own public image at the expense of a competitor. The NCAA and its member colleges and universities engaged in this activity in an effort to cripple Penn State's ability to maintain a nationally renowned football program that is a centerpiece of campus life and community support, and thereby

irreparably harm the citizens and the general economy of the Commonwealth of Pennsylvania.

68.     In attempting to rationalize why he did not impose the "death penalty" on Penn State, Dr. Emmert acknowledged the impact of the NCAA's punishment of Penn State on the citizens of Pennsylvania: "The collateral damage imposed in this case would have been on people who were essentially innocent bystanders...This case had nothing to do with the marching band or the mom-and-pop hotel in State College or the guy who sells hot dogs, all of whom would have been profoundly affected by a multiyear football ban."     (http://articles.philly.com/2012-10-26/sports/34731017_1_ncaa-president-mark-emmert-bowl-ban-penn-state). Ironically, the consequences of the NCAA's unprecedented sanctions against Penn State had precisely the effect that Dr. Emmert allegedly was attempting to avoid.

## I.     Relevant Markets and Threatened Harm to Competition

69.     There are at least three relevant markets harmed by the NCAA's actions:  a market for postsecondary education, a market for Division I football players, and a market for the sale of college football-related apparel and memorabilia. All three markets are nationwide in geographic scope.

70.     The market for postsecondary education comprises colleges and universities across the United States that offer education at the postsecondary level. Penn State's enrollment annually ranks it among the ten largest U.S. colleges and

universities by enrollment. Penn State's significance in this market is further underscored by a 2010 *Wall Street Journal* survey of recruiters from leading companies, nonprofit organizations, and government agencies, which ranked Penn State first in the nation among schools "whose bachelor degree graduates were the best-trained and educated, and best able to succeed once hired."

71.     The market for Division I football players comprises all NCAA Division I football programs that compete for top football talent coming out of the nation's high schools. The most successful college football programs compete aggressively for the relatively small number of high school seniors who can play at the Division I championship level. Indeed, the zeal with which these member institutions compete in recruiting football players is evidenced by the voluminous NCAA rules governing the smallest details of recruitment, ranging from limits on a recruit's visits to a particular campus to limits on the number of times a coach may send the recruit an email. These players are crucial to an NCAA member institution's ability to compete successfully and generate revenue, and many of the most important tools used by institutions in recruiting players—such as athletic scholarships and the opportunity to compete in postseason play—are the very tools restricted by the NCAA sanctions against Penn State.

72.     The market for the sale of college football-related apparel and memorabilia comprises the numerous major college athletic programs that compete

against each other to build national "brands" beyond their campus communities. Penn State is one of handful of programs that has built such a 'brand," largely through the sustained success of its football program.  The ability to compete successfully in this market depends heavily on a college or university's consistent on-field success.

73.     The NCAA sanctions against Penn State threaten severe and irreparable harm to each of these markets through the removal of a major competitor. Rarely, if ever, in the history of college sports has the NCAA imposed sanctions as severe as those forced on Penn State.  The handful of situations that most closely resemble the Penn State sanctions, however, suggest that the sanctions are likely to have the following irreparable damaging effects on Penn State:

(a)     A decline in the success of the football team during the four-year period in which the sanctions are imposed, as a direct result of the reduction in the number of available scholarships, the inability of Penn State to promise high school recruits that they will have the opportunity to compete for a national championship, and the ability of existing Penn State players to transfer to other schools without penalty or to leave the Penn State football team without losing their athletic scholarships.

(b)     A decrease in the success of the football team beyond the four-year period in which the sanctions are imposed.  The effects of the sanctions

are likely to become more pronounced with each progressive year during the period of the sanctions—as an increasing number of "blue chip" recruits shun Penn State for other programs that do not face Penn State's competitive disadvantages. By the time the sanctions period is complete, the anticompetitive harm inflicted by the NCAA will have caused severe damage to Penn State football, and the program that once attracted recruits from across the nation will be unrecognizable to a new generation of high school football players who can remember Penn State only as a noncompetitive program. This is precisely what happened when the NCAA imposed the "death penalty" at Southern Methodist University for only a single season. The team had only one winning season over the following twenty years.

(c)    A significant decline in the Penn State football program's role as a revenue-generator for the university. As a result of the loss of revenue, Penn State necessarily will be required to either (i) reduce the availability and/or quality of some of its programs and/or (ii) raise tuition, either of which will necessarily have an adverse effect on Penn State's status as a first-rate university and on Penn State's ability to attract the quality and quantity of student body that has contributed to Penn State's success. These effects, in turn, can be expected to harm the university's ability to compete

for high-quality faculty and research programs, which in turn will further affect Penn State's attractiveness to incoming students, creating a downward spiral. Indeed, there is already empirical evidence of this harm. According to one recent news report, Penn State's football program has already dropped significantly in profits in 2011-2012: "Perhaps most glaringly absent from the top 10 most profitable programs is Penn State, which held the second spot just a year ago and third the previous year. After a tumultuous year off the field, Penn State fell to 11th place" with a 10% decrease in revenue.

(d)    Reduced alumni interest in the Penn State football program, which will likely result in reduced alumni contributions to Penn State.

(e)    Irreparable injury to the quality of campus life at Penn State. For more than forty years, Penn State has rallied around its football team, and the role that Penn State football plays in campus life has been important to Penn State's ability to attract students from within and outside the Commonwealth. The inevitable decline in the football program that will result from the NCAA sanctions threatens to significantly and irreparably injure Penn State's use of this invaluable recruiting tool.

(f)    Irreparable injury to the "brand" of Penn State football. As the fate of the football program on the field declines, apparel and memorabilia

sales can be expected to decline as well. As difficult as it will be to rebuild the on-field success of Penn State football, rebuilding of the Penn State football "brand" will be far more difficult, and will take far longer, than reassembling a winning football team.

74.     The role that a championship-caliber football program can play in the health of a university has been articulated by Dr. Emmert himself, who, as chancellor of Louisiana State University in 1999, defended the hiring of big-name football coach at a seven-figure salary by saying, "Simply put, success in LSU football is essential for the success of Louisiana State University."

## J.     Threatened Harm to the Commonwealth

75.     As a direct, foreseeable, intended, and proximate result of the actions of the NCAA, the Commonwealth of Pennsylvania has suffered and, if enforcement of the NCAA sanctions is not enjoined, will continue to suffer, severe and irreparable harm. The NCAA's actions have inflicted, and/or threaten to continue to inflict, harm including but not limited to:

(a)     Harm to the many Pennsylvania citizens who depend heavily on the Penn State football program for their jobs and livelihoods, ranging from souvenir vendors to hotel and restaurant employees to tuition-paying students.

(b)    Harm to the state revenue base from diminished football ticket sales.  Attendance at home football games is substantially down in 2012 as compared to recent years, and Penn State's inability to sell out home games necessarily has an economic effect on the secondary market for tickets.

(c)    Harm to the state revenue base from lessened hospitality revenue due to fewer visitors to the Commonwealth on game weekends, as well as a substantial reduction in apparel and memorabilia sales.

(d)    Harm to the state revenue base, and especially to Penn State-related businesses, from the four-year postseason football ban and the vacation of all football wins between 1998 and 2011, further reducing hospitality revenue and substantially reducing apparel and memorabilia sales, including the highly lucrative sales of bowl-related apparel and memorabilia.

(e)    Harm to the state revenue base from the expected decline in jobs attributable to a diminished football program, in the form of loss of recirculation within the Commonwealth of income lost as a result of these lost jobs.

(f)    Harm to the state revenue base from diminished spending by Penn State on capital improvements, goods, services, and supplies.

(g)   Harm to the state revenue base from diminished interest in and attendance at collateral Penn State football events, such as summer football camps, fantasy camps, and coaches' clinics, all of which generate substantial attendance from out-of-state visitors.

(h)   Additional harm to the Commonwealth from the $60 million fine, which will necessarily be paid through some combination of tuition hikes and increased appropriations from the Pennsylvania treasury.

(i)   Harm to current Penn State students, in the form of a diminution in value of the Penn State educational and community experience to which they and their families have made a significant and long-term financial commitment, relying in part on the prominence of the Penn State football program.

76.   Most, if not all, of the injuries described above will last well beyond the term of the sanctions.  The stigma attached will diminish recruitment of students and student athletes, as well as the value of a Penn State education, for decades.

77.   No adequate remedy at law can compensate the citizens of Pennsylvania for the damage being inflicted by the NCAA.

## V.  CAUSE OF ACTION:  VIOLATION OF SECTION 1

## OF THE SHERMAN ACT—15 U.S.C. § 1

78.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

79.     The NCAA and its member institutions, by and through their officers, directors, employees, agents or other representatives have conspired to restrain and suppress competition in the relevant markets using the Sandusky Offenses as a pretext to impose arbitrary, capricious, and unprecedented sanctions on Penn State for actions wholly unrelated to the mission of the NCAA.  The conduct of the NCAA and the member institutions who engaged in the attack on Penn State threatens to harm competition in the relevant markets by depriving consumers of a robust, well-supported, financially stable state-related university in the Commonwealth and eliminating a major competitor in the markets for Division I football players and college football-related apparel and memorabilia.

80.     As a result of defendant's illegal and anticompetitive scheme, the Commonwealth of Pennsylvania and its citizens have suffered and continue to suffer antitrust injury.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes defendant's conduct unlawful.

81.     Defendant and its co-conspirators' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce, including but not limited to hospitality revenues, the flow of scholarship funds, and the allocation of revenues and profits in the relevant markets.

82.     The conduct of the NCAA and its member institutions as a result of the consent decree is ongoing and will continue to impose antitrust injury on the Commonwealth of Pennsylvania and its citizens unless injunctive relief is granted.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays as follows:

A.     the Court issue a permanent injunction to prevent defendant, NCAA, from imposing the sanctions set forth in the consent decree on Penn State;

B.     the Court judge the sanctions imposed on Penn State to be in violation of Section 1 of the Sherman Act;

C.     the Court award plaintiff the costs of the suit, including attorneys' fees, as provided by law; and

D.     the Court award such other and further relief as is just and proper under the circumstances.

DATED:        January 2, 2013        Respectfully submitted,

/s/  James D. Schultz
James D. Schultz, General Counsel
Pennsylvania Bar #83417
Jarad W. Handelman, Executive Deputy General Counsel
Pennsylvania Bar #82629

Governor's Office of General Counsel
Commonwealth of Pennsylvania
333 Market Street, 17th Floor
Harrisburg, PA 17101
Tel: (717) 783-6563
Facsimile: (717) 787-1448
jamschultz@pa.gov
jhandelman@pa.gov

/s/  Melissa H. Maxman
Melissa H. Maxman, Esquire
Pennsylvania Bar # 58009

Cozen O'Connor
1627 I Street, N.W., Suite 1100
Washington, DC 20006
Tel: (202) 912-4800
Facsimile: (202) 640-5520
mmaxman@cozen.com

OF COUNSEL:

Ronald F. Wick, Esquire

Cozen O'Connor
1627 I Street, N.W., Suite 1100
Washington, DC 20006
Tel: (202) 912-4800
Facsimile: (202) 640-5526
rwick@cozen.com

Counsel for Plaintiffs

43